# United States District Court
### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| ANA MARÍA VERÓNIKA MORI SAN MARTÍN | § § § | |
| V. | § § | CASE NO. 4:14-CV-446 Judge Mazzant |
| ALEXANDER CHRISTIAN MARTINEZ MOQUILLAZA | § § § | |

## MEMORANDUM OPINION AND ORDER

On July 7, 2014, Petitioner Ana María Verónika Mori San Martín filed this action seeking the return of her nine-year-old and twelve-year-old daughters, both minors ("A.C.C.M.M. and A.A.M.M."), to Peru (Dkt. #1). On July 18, 2014, United States District Judge Ron Clark issued a temporary restraining order, preventing Respondent from removing the children from the jurisdiction of the Court pending a trial on the merits of the Verified Complaint (Dkt. #6). On July 29, 2014, the Court appointed counsel for Respondent, and on July 31, 2014, Respondent filed his answer (Dkt. #17, #18). On August 1, 2014, the parties consented to the jurisdiction of the undersigned for resolution of this dispute, and this case was referred to the undersigned for all further proceedings on August 2, 2014 (Dkt. #32). The Court conducted a bench trial on Petitioner's Verified Complaint and Petition for Return of the Children on August 5, 2014 (Dkt. #1; #36). A court-appointed Spanish interpreter was present to assist with the proceedings, as most of the parties and witnesses involved requested the assistance of an interpreter. In addition, an attorney ad litem was appointed to interview the children, and be present during the *in camera* interview of the children with the Court.

1

**BACKGROUND**

A.C.C.M.M. was born in Peru in 2002, when her mother, Petitioner, was 15 years-old and her father, Respondent, was 22 years-old. In 2005, A.A.M.M. was born in Peru. Petitioner and Respondent are the biological parents of both children. Petitioner, Respondent, and the children lived in the same familial home in Comos, Lima, Peru, until October of 2008, when Respondent left Peru and moved to the United States for work. He returned to Peru in March of 2009, and Petitioner and Respondent were married on April 8, 2009. Respondent left Peru again in May of 2009, and returned in December of 2009. Over the next few years, this pattern continued with Respondent returning to Peru for approximately one month out of every year, and returning to the United States where he resided for the remaining eleven months. Petitioner and Respondent separated, but continued to act as a married couple until 2012. They are still legally married.

After their separation, the children continued living with Petitioner in the family home in Comos, Lima, Peru. The children attended school there, and lived close to their aunts and cousins. When Respondent would visit Peru, he would stay with a cousin, but would visit with the children and they would stay with him at times. Until June of 2013, the children had never left Peru. Petitioner testified that when Respondent originally left Peru to go to the United States, the plan was to obtain legal resident status for himself, as well as for Petitioner and the children so that the family could move to live in the United States.

In 2013, Petitioner and Respondent began having discussions regarding Respondent's visitation of the children. Respondent expressed a desire for the children to visit him in the United States; however, Petitioner testified that she was wary of this request because at the time Petitioner and Respondent were separated with many problems, and she did not trust that he would return the children to her in Peru. In April of 2013, the Petitioner and Respondent went to

the Peruvian Center for Conciliation and, with the help of the Extrajudicial Conciliator, an attorney, entered into the Final and Complete Certificate of Conciliation that set forth their voluntary compromise and settlement agreement regarding custody of the children, visitation, alimony, and child support. The agreement set out a monthly amount for spousal alimony and a monthly amount of support for the children. The agreement also sets out that the children are to reside in the home of their mother in Peru, allows Respondent to visit the children in Peru as long as he does not alter the schedule of studies, and provides that the children may visit the home of their father in the United States for two weeks in the mid-year school holidays and in the summer holidays, with Respondent bearing the travel expenses and costs for the visits. Both parties signed and fingerprinted the agreement, and both agreed that the agreement was entered into voluntarily.

On June 24, 2013, Petitioner signed an Authorization for Foreign Travel of Children form for both children, which allowed them to travel with Respondent from Peru to the United States beginning on June 25, 2013, and required Respondent to return the children to Peru on July 10, 2013. The children left Peru with Respondent on June 27, 2013, and, as of the date of the bench tiral, had not been returned to Peru.

The testimony revealed that the children were expecting to travel with Respondent to the United States where they would spend a portion of their vacation at Disney World, and other places. At the conclusion of the two weeks, Petitioner testified that she received a call from her oldest daughter, A.C.C.M.M, requesting to stay an additional week so that the children could spend more time with their father. There is some dispute as to how long Petitioner allowed the children to remain in the United States. Petitioner testified that she agreed to only one additional week. Respondent testified that Petitioner agreed to an unspecified amount of additional time.

A.C.C.M.M. indicated that Petitioner agreed to allow the children to remain in the United States an additional 21 days to obtain their permanent resident status. Regardless, the evidence revealed that Petitioner agreed to a limited extension of the children's visit to the United States, did not agree to the children's permanent removal from Peru, and that at the end of the requested extension Respondent refused to return the children.

During the time the children remained in the United States, Petitioner was unable to speak to or contact her children on multiple occasions, did not always know the address where the children were living, and was generally unaware of the circumstances of their lives while living in the United States. On February 12, 2014, after obtaining all the required documents, Petitioner submitted a request to the General Director of Children and Adolescents at the Central Authority of Peru, and on March 3, 2014, Petitioner's Request for Return of the Children was submitted to the United States Department of State through the Peruvian Central Authority.

**LEGAL STANDARD**

Petitioner has brought this action for the return of A.C.C.M.M. and A.A.M.M. under the provisions set forth in the Hague Convention on the Civil Aspects of International Child Abduction (hereinafter "CONVENTION") and the International Child Abduction Remedies Act, 42 U.S.C. § 11601, *et seq*. "The Convention has two primary 'objects': (1) 'to secure the prompt return of children wrongfully removed to or retained in any Contracting State; and' (2) 'to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States.'" *Larbie v. Larbie*, 690 F.3d 295 (5th Cir. 2012) (citing CONVENTION, art. 1). This essentially means that under the Convention, a "wrongfully removed" child "is returned to his or her home country; the return order is not a determination as to the permanent legal or physical custody of the child." *Sanchez v. R.G.L.,* No. 12-50783, 2014

WL 3798186, at *4 (5th Cir. Aug. 1, 2014) (citing *Abbott v. Abbott*, 560 U.S. 1, 5 (2010)). "By focusing on the child's return, the Convention seeks to 'restore the pre-abduction status quo and to deter parents from crossing borders in search of a more sympathetic court.'" *Id*. (citing *England v. England*, 234 F.3d 268, 271 (5th Cir. 2000)).

In a case falling under the Hague Convention, a petitioner must establish by a preponderance of the evidence that the child has been wrongfully removed or retained within the meaning of the Convention. 42 U.S.C. § 11603(e); *De Vasconcelos v. De Paula Batista*, No. 4:10-cv-628, 2011 WL 806096, at *1 (E.D. Tex. March 1, 2011). In making a showing of wrongful removal here, Petitioner must prove that (1) the children were "habitual residents" of Peru at the time of removal; (2) the removal was in breach of Petitioner's custody rights under the law of Peru; and (3) Petitioner had been exercising those rights at the time of removal. *De Vasconcelos*, 2011 WL 806096, at *1 (citing *Edoho v. Edoho*, No. H-10-1881, 2010 WL 3257480, at *4 (S.D. Tex., Aug. 17, 2010); *Van Driessche v. Ohio-Esezeoboh*, 466 F. Supp. 2d 828, 841 (S.D. Tex. 2006)).

Even if a court finds that a child was wrongfully removed, however, a child will not be returned if one of many exceptions is established. *Id*. at *2. The burden shifts to the respondent to establish by a preponderance of the evidence one of the following exceptions: (1) that the proceeding was commenced more than one year after the removal of the child and the child has become "well-settled" in her new environment; (2) that the petitioner was not actually exercising the custody rights at the time of removal or retention or consented to or subsequently acquiesced to the removal or retention; or (3) that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of her views. CONVENTION, arts. 12 & 13; 42 U.S.C. § 11603(e). In addition to these exceptions, a respondent can avoid

5

return of the child by showing the following exceptions by clear and convincing evidence: (1) that there is a grave risk that the return of the child would expose her to physical or psychological harm or otherwise place her in an intolerable situation, or (2) that the return of the child would not be permitted by fundamental principles of the requested state relating to the protection of human rights and fundamental freedoms. CONVENTION, arts. 13(b) & 20; 42 U.S.C. § 11603 (e). "Courts should narrowly interpret a defense and allow it to prevent the child's return only in meritorious cases when the person opposing return has met the burden of proof." *Van Driessche*, 466 F. Supp. 2d at 846.

## ANALYSIS

At the hearing the Court heard testimony from Petitioner, Respondent, Rosa Maria Anglas ("Ms. Anglas"), a friend of Respondent, Wanda Echevarria ("Ms. Echevarria"), a school psychologist who met with the children, Roger William Diaz Vega ("Mr. Diaz"), a friend of both Petitioner and Respondent who testified via telephone in Peru, Silvia Maguina Ramirez, Petitioner's aunt who testified via telephone in Peru, as well as *in camera* testimony from A.A.M.M. and A.C.C.M.M. The parties also submitted documentary evidence including documents from Peru, the custody agreement entered into by the parties, and an English translation of certain Peruvian family law provisions.

*Wrongful Removal*

The Court first addresses whether Petitioner satisfied her burden to show that the children were wrongfully removed from Peru in 2013.

As stated above, to sustain her burden here, Petitioner was required to show that: that (1) the children were "habitual residents" of Peru at the time of removal; (2) the removal was in breach of Petitioner's custody rights under the law of Peru; and (3) Petitioner had been

exercising those rights at the time of removal. *De Vasconcelos*, 2011 WL 806096, at *1 (citing *Edoho*, 2010 WL 3257480, at *4; *Van Driessche,* 466 F. Supp. 2d at 841.

Although not defined in the Convention, a child's habitual residence is the place one would call his customary residence. *Friedrich v. Friedrich*, 983 F.2d 1396, 1401 (6th Cir. 1993) (*Friedrich I*). A person can have only one habitual residence. *Id.* The Court must look back in time and not forward in determining a child's habitual residence. *Id.* It is undisputed that the children were habitual residents of Peru before they left with their father in June of 2013.

Petitioner is also required to prove that the removal of the children was in breach of her custody rights under Peruvian law. The removal or retention of a child is wrongful where "it is in breach of custody attributed to a person… under the law of the [country] in which the child was habitually resident immediately before the removal or retention," and where, "at the time of removal or retention those [custodial] rights were actually exercised…" CONVENTION, art. 3. The Peruvian Civil Code titled "Codigo de Los Niños y Adolescentes" provides that when the parents are separated, "the custody of the children or adolescents is determined by mutual agreement between both parents, taking into consideration the child's and adolescent's opinion." Codigo de Los Niños y Adolescentes, art. 81 (Dkt. #21, Ex. 2 at 3). If there is no agreement, "custody shall be resolved by the specialized judge, ordering the measures required to comply with such order." *Id*.

The Hague Convention makes a distinction between rights of custody and rights of access. The Hague Convention's provisions on the Civil Aspects of International Child Abduction define "rights of custody" as those rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence. CONVENTION, art. 5. "[R]ights of access," on the other hand, include the right to take a child for a limited period of

7

time to a place other than the child's habitual residence. *Id.* Petitioner and Respondent in this case entered into a Certificate of Conciliation, which provides that Petitioner has primary custody of the children, and grants Respondent visitation with the children in the United States, as follows:

> only for the mid-year holidays (July) and in the summer holidays for two weeks maximum, after which they must be returned by his [sic] father… to this city (Lima-Peru) to continue [in] the care of the mother…

(*See* Dkt. #1, Ex. 7 at 7). It is also undisputed that Petitioner has primary custody of the children, and was exercising her custody rights at the time the children were removed.[1]

Thus, the Court determines that Petitioner has satisfied her burden to show by a preponderance of the evidence that she had custody rights, and that the children were removed from Peru in violation of those rights. The Court will now turn to the various exceptions to removal to see if any apply in this case.

*Affirmative Defenses*

Once the Petitioner establishes that the Respondent wrongfully removed the Child from his habitual residence, the Child must be returned unless the Respondent can establish one of the Convention's narrow affirmative defenses. *Sealed Appellant*, 394 F.3d at 343 (citation omitted).

When an action for return of a child is commenced more than one year after the removal or wrongful retention of the child and the child has become 'well-settled' in her new environment, the Court is not required to order the return of the child. *De Vasconcelos*, 2011 WL 806096, at *4 (citing CONVENTION, art. 12). The well-settled exception must be proven by Respondent by a preponderance of the evidence. 42 U.S.C. § 11603(e). In the present case, Respondent wrongfully retained the children on approximately July 10, 2013, after the expiration

---

[1] During his closing argument, Respondent agreed that Petitioner had met her burden to demonstrate that the children were wrongfully removed or retained within the meaning of the Convention.

of the two weeks indicated on the children's travel documents. Although there was evidence presented at the trial that Petitioner agreed to allow the children to remain in the United States for an additional period of time, there was no evidence that she agreed to allow the children to remain in the United States indefinitely. Petitioner's proceedings in this Court were filed on July 7, 2014, which is within the one year time frame. Accordingly, the well-settled objection does not apply to the present case.

Next, the Court is not required to order the return of the children if Petitioner was not actually exercising her custody rights at the time of the removal or retention, or had consented to or subsequently acquiesced in the removal or retention. CONVENTION, art. 13(a). "Under Article 13(a), '[t]he consent defense involves the petitioner's conduct prior to the contested removal or retention, while acquiescence addresses whether the petitioner subsequently agreed to or accepted the removal or retention.'" *Larbie*, 690 F.3d at 308 (citing *Baxter v. Baxter*, 423 F.3d 363, 371 (3d Cir. 2005)). The focus of the inquiry is the petitioner's subjective intent, as "evidenced by the petitioner's statements or conduct, which can be rather informal." *Id*. (citing *Nicolson v. Pappalardo*, 605 F.3d 100, 105 (1st Cir. 2010)). "In examining a consent defense, it is important to consider what the petitioner actually contemplated and agreed to in allowing the child to travel outside its home country. The nature and scope of the petitioner's consent, and any conditions or limitations, should be taken into account." *Id*. (citation omitted).

It is undisputed that Petitioner was exercising her custody rights at the time of the removal and wrongful retention. Although there was some testimony that Petitioner consented to the removal, it is clear that Petitioner consented to the removal for a two week period, as set forth in the Certificate of Conciliation and on the travel paperwork of the children. The evidence also showed that Petitioner consented, or acquiesced, to a limited extension of the travel period for

either a week or 21 days; however, the testimony was clear that Petitioner never intended for the children to leave Peru and live in the United States indefinitely. While there was some suggestion that the plan was to bring the children to the United States to establish their permanent residency, and then subsequently bring Petitioner to the United States as well to obtain permanent residency in the United States, the testimony was equally clear that the children went to the United States on vacation and always intended to return to Peru to finish their final examinations in school. The children brought only two weeks of clothing with them, left many of their possessions in Peru, and obtained special permission from their school to take their final examinations upon their return from their vacation in the United States. There is no indication that Petitioner's subsequent agreement to the extension of the vacation was consent to allow the children to permanently live in the United States. Accordingly, the consent defense has not been established by a preponderance of the evidence, and will not bar the return of the children to Peru.

Next, the Court is not required to order the return of the children if the Respondent shows by clear and convincing evidence that there is a "grave risk that [their] return would expose the child[ren] to physical or psychological harm or otherwise place the child[ren] in an intolerable situation." CONVENTION, art. 13(b); 42 U.S.C. § 11603(e). "A grave risk of harm can be established when return of the child to the country of habitual residence puts the child in 'immediate danger prior to resolution' of the underlying custody dispute.'" *Gallardo v. Orozco*, 954 F. Supp. 2d 555 (W.D. Tex. 2013). "The grave risk exception is to be narrowly construed." *Taylor v. Hunt*, No. 4:12CV530, 2013 WL 620934, at *8 (E.D. Tex. Jan. 11, 2013) (citing *England*, 234 F.3d at 270-71).

"[A] grave risk or intolerable situation exists where return of the child would send the child to a zone of war, famine, or disease, or in cases of serious abuse or neglect." *Taylor*, 2013 WL 620934, at *8 (citing *Vazquez v. Estrada*, 2011 WL 196164, 5 (N.D. Tex. 2011) (finding no grave risk exception because of the "spiraling violence and surge in murders in Monterrey" and because of "specific violent acts that have been committed in the school [the child] attended in Monterrey and in the neighborhood where Petitioner resides.")). Due to this high standard, findings of grave risk are rare. *See, e.g., England*, 234 F.3d at 271 (finding that the alleged "grave risk of psychological harm if [the child] should be separated from [the abducting parent]" is "inappoite to the 'grave risk' determination" under the guidance of other Hague Convention cases); *Gallardo*, 954 F. Supp. 2d at 576 (holding that unsupported allegations of petitioner's prostitution "fall extremely short of reaching the high threshold necessary to establish the grave risk of harm affirmative defense."); *Sanchez v. Sanchez,* No. SA-12-CA-568-XR, 2012 WL 5373461, 3 (W.D. Tex. Oct. 30, 2012) (finding that evidence of past physical abuse and drug use by the petitioner mother's ex-boyfriend were insufficient for finding of grave risk where the petitioner testified she had ended the relationship and the children would therefore not be exposed to those conditions upon their return to Mexico); *Taylor*, 2013 WL 620934, at *8 (holding undisputed evidence that Petitioner "would leave [the child] with other adults… for extended periods of time in order to work as a dancer" did not rise to the level of grave risk); *Edoho,* 2010 WL 3257480 (finding that respondent failed to meet burden on grave risk defense when there was conflicting testimony regarding abuse of the child).

Respondent and his witnesses testified that Comos, a county in Lima, Peru, where the children and Petitioner reside is a beautiful, but dangerous place. Respondent testified that when he was ten-years-old, his cousin was kidnapped and strangled near the school, which is five

minutes away from the school where the children are enrolled. Respondent testified that the drivers in Comos are negligent, and that the children witnessed a car accident in which a small child was hit and killed by a car. Respondent testified that there is a lot of criminal activity, and that on many occasions cell phones and wallets are stolen from Petitioner and other family members. Ms. Anglas testified that she feared for all children living in Comos. Ms. Ramirez testified that children are not in danger in Comos, that they live in a suburb area where they have many friends and a police officer that lives nearby. Ms. Ramirez agreed that some bad things have happened to her family members, but that they were many years ago. Based on this evidence, the Court finds that Respondent has not met his burden to show by clear and convincing evidence that Comos, Lima, Peru is a dangerous place.

Respondent also testified that returning the children to Peru would be a grave risk to the children because Petitioner often drank alcohol and left the children either unattended or with another adult so that she could go to parties. Respondent testified that the children have seen their mother intoxicated to the point where she could not stand up or take care of the children. Respondent also testified that on one occasion Petitioner left A.C.C.M.M. alone in the home while she attended a party. Petitioner agreed that she had left A.C.C.M.M. in the home while she attended a party, but stated that another adult, Mr. Diaz, stayed overnight with her, and A.C.C.M.M.'s grandmother arrived in the morning to pick her up. Mr. Diaz agreed that he stayed overnight with A.C.C.M.M. on that occasion, and that he has seen Petitioner consume alcohol at parties. Respondent also testified that Petitioner hit one of the children with a belt on one occasion. Petitioner testified that she has never hit the children with a belt or spanked the children.

As this Court has noted previously, the question before the Court is not which parent would be the better parent. *Stewart v. Marrun*, No. 4:09cv141, 2009 WL 1530820, at *4 (E.D. Tex., May 29, 2009). At the trial, the Court informed both parents that, in the Court's opinion, they were both loving parents who both had the best interest of the children at heart. This testimony by Respondent is simply not enough to establish by clear and convincing evidence that the children would be in grave risk of physical or psychological harm if returned to Peru, or that Peru cannot provide adequate protection to the children. The issue of custody must be decided in Peru.

Finally, the Hague Convention also permits the Court to refuse to return a child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of her views. CONVENTION, art. 13. It is not enough that the child has maintained friendships, prefers her new residence over the country of removal, or enjoys a more stabilized situation to support a finding that the child is mature enough for the Court to take into account her views. *England v. England*, 234 F.3d 268, 272 (5th Cir. 2000) (finding 13 year-old had not attained sufficient maturity). No age is too young or old enough as a matter of law for the exception to apply, but must be determined on a case-by-case basis. *See id.*

In this case, the children remained outside the courtroom during the trial and were represented by an attorney ad litem during the proceedings. At the close of the parties' cases, the Court questioned both children separately *in camera*. The attorney ad litem was present for this questioning and given the opportunity to question her client.

The Court finds that it is not appropriate to take into account A.A.M.M. or A.C.C.M.M.'s view here. During the *in camera* interview, A.A.M.M., nine-years-old, was very timid, soft-spoken, and unaware of the purpose of the court proceedings. A.A.M.M. testified that life in

Peru was both fun and not fun, since her mother would allow them to have sleepovers at the house and take them to the movies. A.A.M.M. testified that when she came to the United States she thought they were going on vacation with their father and would return to Peru after a few weeks. Due to the young age, immaturity, and timidity of A.A.M.M., the Court did not reach the question of whether she would prefer to live in the United States or Peru.

      A.C.C.M.M., twelve-years-old, testified that when she came to the United States with her father, she thought it was a vacation, but that she was thinking about staying in the United States. A.C.C.M.M. stated that she has a very good relationship with her mother, in that she tells her everything and talks to her about her life. She also testified that she gets along fine with her father, and he helps her with school. However, of concern to the Court is that when asked where she would like to live, A.C.C.M.M. stated that she wants to live with her father and her mother in the United States as one family in one house. A.C.C.M.M. did not appear to grasp that her mother lived in Peru, and, at least for the present time, was not coming to the United States. Further, it was not clear that she understood the purpose of the proceedings, and that gravity of her choice to live in the United States. A.C.C.M.M.'s stated reason for wanting to live in the United States was because she liked the school here better, and it was not as dangerous as it was in Peru. The Court finds that A.C.C.M.M. is a quiet, well-spoken, and articulate young lady who clearly cares about her parents and her sister very much, but she was confused by the circumstances producing the litigation, and did not understand the choice she was being asked to make. A.C.C.M.M.'s desired outcome is one that is not possible given the circumstances of her mother's citizenship in Peru and the fact that her father has a girlfriend here in the United States, and A.C.C.M.M. did not grasp the impossibility of the situation even after probing by the Court.

"Like the grave risk exception, the 'age and maturity' exception is to be applied narrowly." *England*, 234 F.3d at 272 (citing 42 U.S.C. § 11601(a)(4)); *see also Tsai-Yi Yang v. Fu-Chiang Tsui*, 499 F.3d 259, 278 (3d Cir. 2007) ("The exceptions are construed narrowly so their application does not undermine the express purposes of the Convention.") (internal quotations omitted). "[A] 'court must apply a stricter standard in considering a child's wishes when those wishes are the sole reason underlying a repatriation decision and not part of some broader analysis,' such as whether the child would suffer a grave risk of harm if returned to his or her habitual residence." *Tsai-Yi Yang*, 499 F.3d at 278 (citing *De Silva v. Pitts*, 481 F.3d 1279, 1286 (10th Cir. 2007)). The district court in Tsai-Yi Yang found that a ten-year-old child was "bright, intelligent and pleasant," but that the reasons she expressed for wanting to remain in the United States "did not include particularized objections to returning to Canada, but rather it indicated that she possessed a more generalized desire to remain in Pittsburgh similar to that of any ten-year-old having to move to a new location." 499 F.3d at 279. The reasons that the child gave included "liking her school, her preference for living in a house rather than a small apartment, and having friends and brothers." *Id.* While the Fifth Circuit has recently upheld the decision of the district court finding that a thirteen-year-old was sufficiently mature to establish the mature child defense, the district court there found that the child specifically expressed that she did not want to visit her father while he was in the United States, demonstrated an understanding of the proceedings and of her right to state her preferences, and stated a desire to remain in the United States with her mother and stepfather. *Vasconcelos v. Batista*, 512 F. App'x 403 (5th Cir. 2012). Here, the Court finds that neither of the children understood the proceedings and their right to state their preferences, and did not unequivocally express a desire to remain in the United States for any reason other than generalized affinity for this country after

having lived here for the last year. Thus, the Court finds that Respondent failed to meet his burden to establish that one or more of the affirmative defenses apply to prevent the return of the children in this case.[2]

## CONCLUSION

The Court's role in this matter is limited to determining only whether the children were wrongfully removed from Peru. *See* 42 U.S.C. § 11601. Questions regarding custody, Petitioner's alleged wrongful conduct, or the best interests of the children are a matter for the Peruvian courts, and not the undersigned. Because the Court finds that there was wrongful removal here, and none of the affirmative defenses apply in this case, the Court finds that Petitioner's Verified Complaint and Petition for Return of the Children on August 5, 2014 (Dkt. #1) is **GRANTED,** and the children should be immediately returned to Peru in the care of Petitioner.

The Court further finds that, pursuant to 42 U.S.C. § 11607, Respondent is required to bear the costs incurred by or on behalf of Petitioner in this case, including court costs, legal fees, foster home or other care during the course of proceedings in the action, and transportation costs related to the return of the child. 42 U.S.C. § 11607(b)(3).

**IT IS SO ORDERED.**

---

[2] Respondent did not raise the exception that fundamental principles of human rights and fundamental freedoms would not permit the children's return. CONVENTION, art. 20; 42 U.S.C. § 11603(e). This exception simply has not been shown in this case.

**SIGNED this 8th day of August, 2014.**

_____
AMOS L. MAZZANT
UNITED STATES MAGISTRATE JUDGE